Paul D. Cooper and Esther I. Cooper v. Commissioner.
Cooper v. Commissioner
Docket No. 1154-66.
United States Tax Court
T.C. Memo 1967-122; 1967 Tax Ct. Memo LEXIS 141; 26 T.C.M. (CCH) 554; T.C.M. (RIA) 67122; May 31, 1967
*141 Leslie H. Wald, 1107 Tower Bldg., Denver, Colo., and Lawrence G. Empey, for the petitioners. Frederick B. Strothman, for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the petitioners' income tax of $5,735.83 for 1962 and $2,180.37 for 1963. The only issues for decision are whether the petitioners are entitled to deduct a loss in 1962 of $14,330.15 resulting from the demolition of a building on Delgany Street and a loss in 1963 of $4,568.98 from the demolition of a residence on Brighton Blvd., both in Denver. The contention of the Commissioner is that the claimed losses were properly disallowed because the petitioners wanted only the land and their intention when they bought these properties was to demolish the buildings. Findings of Fact The petitioners, husband and wife, reside at 6850 West 36th Place, Wheatridge, Colorado, and filed joint income tax returns for 1962 and 1963 with the district director of internal revenue for Colorado. The petitioner Paul owns a corporation named Paul's Custom Grinding Service, Inc. and operates its business located on Brighton Blvd. in Denver. *142 Sam Johnson owned a property at 3606 Delgany Street separated from Paul's grinding business by an alley. Johnson's property consisted of six lots, each 25 by 125 feet, on which had been built in 1886 a two and a half story brick and stone public school building. The building had been converted in the late 1930's into an apartment house with 13 rental units. Johnson was renting ten of those units in 1961 and one was occupied rent free by a resident manager. Eight of the units were partially furnished. The other 5 were unfurnished and two of the latter were vacant at all times material hereto. Johnson was offering to sell the entire property in 1960 and 1961 for $20,000. He offered it several times to Paul in 1960 and 1961 without success until, early in 1961, Johnson reduced his price to $18,000 with an easier payment plan and Paul became interested. Johnson took Paul through the building, showed him some improvements he had made and told Paul the units were renting for from $20 to $35 per month. Paul had the title examined and the attorney advised him on March 28, 1961 that a Notice of Condemnation had been filed in 1950 and a Notice of Violation of the Housing Code had been filed *143 in November 1959 but both had been released. Paul did not know of any other difficulties that Johnson may have had with city authorities in regard to the condition of the building. Paul and Johnson executed a Receipt and Option relating to the property on March 21, 1961 and on April 26, 1961 Paul purchased the property for $18,000. The parties hereto have stipulated that a correct application of the purchase price is $14,000 to the building and $4,000 to the land. The Receipt and Option provided interalia that a note of the purchaser was to be given for the unpaid part of the purchase price, secured by a first deed of trust and a rental assignment payable in monthly installments of $150 or more including interest of 5 percent, and that "present usage of this building is not to be changed without the written consent of the Grantor herein." Johnson gave the petitioner a bill of sale for stated equipment in eight of the apartments on April 26, 1961. The Department of Health and Hospitals of the City of Denver sent Johnson a letter on March 1, 1961, in regard to an inspection made on February 14, 1961, listing a number of infractions but Paul did not know of the existence of that *144 letter on March 21, 1961, when he signed the receipt and option or on April 26, 1961 when he purchased the property. Paul's opinion, at the time he bought the property, was that the building was in sufficiently good condition for him to continue renting the units although some of the rooms were dirty. He thought that if they were clean, he could rent them for about $40 a unit. He had at that time no intention to demolish the building and his only purpose in buying was to make profits from renting the units in the building. He did not know what Johnson's expenses had been for any of the utilities in the building but he had had some experience in renting a property at another location and he thought he could take care of the Delgany Street property because it was located just across the alley from his business. The building was inspected about a week after Paul purchased it and the inspector told Paul he would either have to improve the conditions in the building or have the tenants vacate it. Paul then got an estimate that it would cost about $5,800 to $6,000 to put the building in the condition that the Health Department would demand. Paul received the rents for the first month *145 after he owned the building, but made no improvement during that period. About a month after he bought the property he received a notice from the Health Department that he would either have to make certain stated improvements in the building or have the tenants vacate and demolish the building because it was unfit for human occupancy. He wrote the Department on May 27, 1961 replying to its letter of May 24, 1961 and stated that he planned to change the use of the building and have his tenants move out, but no work had been begun and he requested an extension to June 15, 1961. At or about the same time he gave notice to the tenants to vacate and they started to move out. Considerable damage was done to the building by vandalism during the first month that Paul owned it and for some time thereafter. In July 1961 he had a high wire fence built around the property with a lock on the only gate. Paul made no improvements during the short time that he owned the building before his notices to vacate, but he then received estimates on remodeling to change the use of the building to a warehouse or garage and decided to demolish the building. He advised Johnson of this decision and received *146 his consent by paying Johnson $5,000 of the unpaid purchase price. The building was demolished in 1962 and on April 2, 1962, the Health Department released the order to demolish. Since the building was demolished no use has been made of the land. The Commissioner in determining the deficiency for 1962 disallowed a claimed deduction of $14,330.15 for demolition loss on the Delgany Street building. Mike Ortiz owned and occupied a house and lot at 3621 Brighton Boulevard. It was the next lot to five owned by Paul on which his grinding service business was located. Ortiz had wanted to sell his property at 3621. He told Paul that he wanted to sell it. Paul asked the price, was told and said to Ortiz that he would buy it. Paul, acting for Esther his wife as purchaser, made all of the arrangements with Ortiz involved in the sale. Esther and Ortiz signed a Receipt and Option in regard to 3621 dated March 13, 1963 and Ortiz and Melinda Ortiz executed a deed dated April 1, 1963, transferring the property to Esther. It is stipulated that the purchase price was $7,000 and, if a demolition loss is allowable, the amount of the loss is $4,599.80, representing $4,104.80 for the building and *147 $495 for the cost of razing it. Paul told Ortiz that he could continue to live in the house for a month rent free until he could find another place to live. Esther was never inside, never inspected the property, and the evidence does not show that Paul was ever in it, had ever inspected it or why he wanted Esther to buy it. The Building Inspection Department of the City of Denver issued an Order dated July 10, 1963, to Esther "to wreck or repair [the 3621 Brighton Boulevard property] within thirty (30) days from date of this notice." Two inspectors of the Building Inspection Department had made a Substandard Housing Report on the building dated June 4, 1963, but the evidence does not show whether or not it came to the attention of either petitioner. A wrecking permit dated July 18, 1963 was issued and the building was demolished in 1963. The evidence does not show what use of the property, if any, was made thereafter. The Commissioner, in determining the deficiency for 1963, disallowed a claimed demolition loss of $4,568.98 on the Brighton Boulevard house. All stipulated facts are incorporated herein by this reference. Opinion MURDOCK, Judge: The Commissioner's determination *148 that the loss on the demolition of the Delgany Street building is not deductible is presumed to be correct. He also depends upon evidence relating to the Health Department's requirements regarding the condition of the building and the rentals which Johnson had been receiving. From these the question arises of how Paul could reasonably have believed that he could continue renting the units or make any money if he did continue, in the light of the Health Department's requirements of which he should have been aware. Paul's case is supported by his sworn testimony that he had no other intent than to continue renting and making money from renting the property, by the fact that the parties stipulated the cost of the building at $14,000 and the cost of the land as $4,000, by the fact that Paul never made any use of the land after the building was torn down and the question, which thus arises, of what incentive he could have had for demolishing the building at the time he bought it. It seems rather strange that Paul did not know before he bought the property more than he appears to have known about the problems involved in renting to tenants. However, the fair, though not heavy, preponderance *149 of the evidence supports the conclusion that Paul did not intend to demolish the building at the time he bought the property and it is so held herein. Esther knew little or nothing about the details of the acquisition of the Brighton Boulevard property or about the property itself. She had left the negotiations and decisions to Paul, but he did not testify in regard to this property. Esther testified that she did not intend to demolish the house when she bought it, but her testimony as to what she did intend is not at all convincing. She never rented the property and apparently the house stood empty from shortly after her purchase until it was demolished. Pictures of the property in evidence show that the house was in very bad condition on June 4, 1963 and the evidence does not show what its condition was at the time of the purchase on April 1, 1963. Here again the burden is upon the petitioners to prove error in the Commissioner's determination by a fair preponderance of the evidence and on this issue they have failed in their burden of proof. Decision will be entered under Rule 50.